**GULF OIL CORPORATION,**
Plaintiff in Error,

v.

**William McCOY and Evelyn McCoy, his wife,**
Defendants in Error.

No. 40823.

Supreme Court of Oklahoma.

May 31, 1966.

Rehearing Denied Aug. 2, 1966.

Comet C. Johns, Richard L. Bohanon, Oklahoma City, for plaintiff in error.

Richard James, Stroud, for defendants in error.

PER CURIAM:

In the trial court William McCoy and Evelyn McCoy, his wife, sued the Gulf Oil Corporation for damages caused by the salt water pollution of their stock water pond, constructed on their preference right school land lease. In this opinion, the parties will be referred to as they appeared in the court below, where the McCoys were plaintiffs and Gulf Oil Corporation was the defendant. In the trial court, the jury returned a verdict for the plaintiffs in the amount of $5,000.00 compensatory damages and $500.00 punitive damages. From this verdict and judgment thereon, the defendant has perfected this appeal.

The facts are undisputed that the defendant, Gulf, was engaged in secondary recovery operations in the East Payson Skinner Sand Unit, and was the operator of the unit. In its operations, Gulf installed a water injection unit upstream about 500 feet from the plaintiffs' said stock water pond on land adjoining the land occupied by the plaintiffs. As a part of its operations, the defendant, Gulf, constructed a large earthen salt water disposal pit on this adjoining land. In December of 1961, (or early in 1962,) this salt water disposal pit overflowed and according to Gulf's production foreman who testified on behalf of Gulf, such overflowing could have caused pollution to the plaintiffs' stock water pond downstream from this salt water disposal pit.

The evidence of the plaintiffs tended to show that a part of the wall of this salt water disposal pit washed away in March or April of 1962 and the salt water drained into plaintiffs' stock water pond. The evidence is clear that the stock water pond of the plaintiffs was polluted with salt water and there is ample evidence to show that it came from Gulf's operation. Gulf was not the oil and gas lessee operator on the land covered by the plaintiffs' lease.

Gulf's foreman testified that when the plaintiffs advised him that their pond was contaminated with salt water in June or July of 1962, he went down to the pond and tasted the water and found it to be salty and that he took samples from the pond and he also testified that he dug five holes in or within fifty-five feet from the ravine upstream from the plaintiffs' pond and that two of the holes were dug in the bottom of the ravine, one west of the salt water disposal pit some 75 or 80 feet and the other in the ravine or draw at the plaintiffs' fence line, and that both of these test holes had salt water seeping in them. On learning of this condition, Gulf filled in the salt water disposal pit then existing and dug another pit adjacent to the old one and lined it with vinyl plastic lining. Both plaintiff and Gulf's foreman testified that Gulf did dig another water storage hole on the plaintiffs' lease and hauled tank water and filled this hole with water for the plaintiffs' cattle on at least two occasions.

The plaintiffs were in the possession of their land by virtue of a preference right lease from the Commissioners of the Land Office. They went into possession of this land under this type of lease in 1952 and it had been renewed to them periodically since that date. The last renewal of their preference right lease was for a period of five years from January 1, 1962, and this lease will expire on December 31, 1966. Subject to the approval of the Commissioners of the Land Office, this preference right lease could be sold. The testimony was that it had a value of from $5000.00 to $5500.00 before the subject pond became polluted and that thereafter it had a value of from some $2500.00 to $4000.00.

The land which the plaintiffs leased from the Commissioners of the Land Office was used by them solely in their cattle business and dairy operations. The stock water pond on their lease was constructed in 1954 by the Soil Conservation Service, after

a survey of the entire 160 acre site by an engineer of the Soil Conservation Service. This engineer testified that the pond was constructed at the only place on the entire 160 acre lease which would have been approved by that agency and that no other site on the plaintiffs' lease would have come up to its standards and qualifications.

Proof on behalf of the plaintiffs showed that from April of 1962, their cattle commenced losing weight and their milk volume decreased and in September of 1962 their milking operations ceased entirely. Proof by the veterinarian was of effect that this probably was caused by salt water poisoning from drinking from plaintiffs' pond and that a cow often made slow progress in recovering from the effects of salt water poisoning. The plaintiffs' evidence showed a loss in the market value of their cattle between April and September, 1962, in the amount of some $2800.00 to $3000.00. The plaintiffs also made proof tending to show the loss of Grade C milk sales during this interval.

The evidence tended to show that the salt water contamination of the stock water pond would be slow in correcting itself (if it would). There was sufficient evidence in the record from which the trial court, in giving its instructions, and the jury in its deliberations, could have determined that the damage to the plaintiffs' stock water pond and leasehold estate was permanent.

On the question of damages, the Court permitted testimony as to the value of the plaintiffs' preference right lease before contamination of the stock water pond and the value of the lease after the contamination of the pond. It was the giving of this instruction that the defendant Gulf urges as reversible error.

The instruction complained of reads as follows:

"You are instructed that in arriving at the damages done to the preference right school land lease in this case, if any you find, you will first determine the value of the preference right school land lease, including the improvements placed thereon by the plaintiffs, prior to the damage or injury from pollution. You will then determine the value of the preference right school land lease, including the improvements placed thereon by the plaintiffs, after it had been injured by the pollution and the difference between these two values is the measure of damages to the preference right school land lease of the plaintiffs, which is one of the elements of damages which they seek to recover in the case."

In deciding whether or not the giving of this instruction was error, we think it is of material significance that, according to their evidence, the plaintiffs' operations on this lease were confined entirely to the raising of cattle and dairy operations; that the place was more suited to stock-raising than other types of farming; and that according to plaintiffs' engineer the only place on the plaintiffs' lease suitable for a stock water pond was the location on the lease where the pond in question was constructed.

■ In their brief on the issue of error in the granting of Instruction No. 7, supra, the defendant Gulf cites the case of Anderson-Prichard Oil Corp. v. McBride, 188 Okl. 384, 109 P.2d 221. This was an action for damages brought by the holder of a preference right school land lease for damages caused by the oil and gas lessee operator in carrying out its operations on the preference right school land lease. The oil and gas operator was operating under a valid oil and gas lease granted by the Commissioners of the Land Office. In the instant case, the defendant Gulf was unit operator of a water recovery operation and was not the oil and gas lessee of the plaintiffs' lease. The activities which caused contamination to the plaintiffs' stock water pond were on land adjoining the plaintiffs' preference right school land lease. The Court summed up the problem in the McBride case as follows:

"The question is therefore whether the preference right of the surface lessee is damaged or lost by reason of mining

operations of the lessee of an oil and gas lease from the State. The State being the lessor in both leases, the assumption is that it contemplated that the rights of both lessees might exist and be enjoyed at the same time, and that the operations of the oil and gas lessee would not be violative of the provisions of the Enabling Act, which provided that the agricultural lessee should have a preference right to purchase the land in event it was sold by the State, and also provided that the land valuable for oil and gas might be leased for oil and gas purposes by the State."

It is noted, too, that in the instant case, the evidence on behalf of the plaintiff showed that the injury and damage to his preference right lease was permanent, much to the same extent as if the entire lease had been taken by condemnation. A careful review of the evidence justifies the finding by the jury that the entire preference right lease of the plaintiff was taken not by condemnation but by contamination through the defendant's operations.

This Court indicated in the McBride case, supra, that where such a situation existed the rule would be otherwise than quoted in the McBride case. We think the language of the Court is controlling in this case and is quoted:

"Such being the nature of the preference right, in what manner, or to what extent, was it lost or diminished by the operations of the defendant under its oil and gas lease? For while such right has been held a valuable right, and is the subject of sale (Noel v. Barrett, 18 Okl. 304, 90 P. 12) and is to be considered when the land is taken by condemnation proceedings (State v. Oklahoma Ry. Co., 153 Okl. 76, 4 P.2d 1009), *it must be shown to have been taken away or impaired before damages may be awarded for the loss or impairment thereof. There is no such showing in the present case.*" (emphasis supplied)

█ The other case cited by Gulf, Mid-Continent Pipeline Company v. Blackburn,

Okl., 361 P.2d 845, although appearing to be in point, is also distinguishable from the instant case. In the Blackburn case, there was damage to a pond on a preference right lease from the Commissioners of the Land Office, much the same as in the instant case, only in the Blackburn case, the damage was from a broken oil line crossing the pond, and there was no evidence that the damage was permanent. In the instant case, as heretofore pointed out, the plaintiff used his preference right lease solely for dairy operations and cattle raising, and there is sufficient evidence in the record from which the jury could have found that the damage to the pond in question could well continue through the balance of the term of plaintiffs' preference right lease and successive renewed periods thereof, and that the damage was permanent. There was ample evidence from which the jury could determine that there was no other source for stock water on the plaintiffs' preference right lease and that this source was ruined and that by reason thereof the market value of the plaintiffs' preference right lease was decreased. The trial court, in giving the questioned instruction, treated the damage to the plaintiffs' preference right lease, much the same as if his lease had been destroyed or taken by condemnation. In view of the evidence, we think the instruction given by the trial court correctly stated the law.

In Producers Supply Company v. Maple Leaf Oil Company, 82 Okl. 120, 198 P. 577, the court held in Syllabus 1 as follows:

"The measure of damages for injury to a leasehold estate is the difference in the market value immediately before and after the injury, subject to the qualifications that, if such property as may be destroyed or removed, although it is a part of the realty, has a value without reference to the soil on which it stands or out of which it grows, a recovery may be [had] for the value of the thing destroyed or removed, and not for the difference in the value of the land or leasehold before and after such destruction".

See also 15 Am.Jur. 518, Section 109; 32 Am.Jur. 222, Section 239, and Oklahoma Turnpike Authority v. Betremieux, 208 Okl. 171, 254 P.2d 771.

We hold that there was sufficient evidence in the record to warrant the giving of Instruction No. 7 and that in view of the evidence, the giving of Instruction No. 7 was not error.

The other proposition presented by Gulf was the proposition that the evidence was not sufficient to support the verdict for punitive damages. The testimony of the defendant Gulf's production foreman showed that the salt water pit did overflow in December of 1961 and that this overflow could have caused pollution to the plaintiffs' stock water pond. He further testified that he did not tell the plaintiffs of this condition. and permitted the plaintiffs to water their cattle from this contaminated pond until the plaintiff himself found it out.

The statute permitting recovery of exemplary damages is found in 23 O.S.1961, § 9, which reads as follows:

"In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud or malice, actual or presumed, the jury, in addition to the actual damages, may give damages for the sake of example, and by way of punishing the defendant."

This statute has been interpreted by this Court in a number of cases, and there is a uniform holding that when there is evidence of reckless and wanton disregard of another's rights, malice and evil intent may be inferred. Garland Coal & Min. Co. v. Few, 10 Cir., 267 F.2d 785; Tomlinson v. Bailey, Okl., 289 P.2d 384; Fuller v. Neundorf, Okl., 293 P.2d 317; Taxicab Drivers Local Union No. 889 v. Pittman, Okl., 322 P.2d 159.

■ ■ The contamination of the stock water pond by salt water must be carefully avoided by oil and gas operators. When it is remembered that as in this case, Gulf permitted salt water to trickle continuously as waste from its salt water injection well pump into the ravine above plaintiffs' pond, over a period of months, and, further, knowingly permitted the salt water pond to overflow into the stock pond, with knowledge that the plaintiffs' cattle used the pond, and made no effort to notify the plaintiffs of the contamination, such acts, in our opinion, amount to a gross disregard of the plaintiffs' rights, and are sufficient to justify an award of exemplary damages. A careful review of the evidence in the record convinces us that the award of punitive damages in this case was justified and that the amount awarded is not excessive.

The judgment is affirmed.

The Court acknowledges the services of Special Master Donald Royse, who with the aid and counsel of Special Masters Arthur G. McComas and James P. Garrett, prepared. a preliminary advisory opinion. These attorneys had been recommended by the Oklahoma Bar Association and appointed by the Court. The Chief Justice then assigned the case to WILLIAMS, J., for review and study, after which and upon consideration by the Court, the foregoing opinion was adopted.

JACKSON, V. C. J., and DAVISON, WILLIAMS, IRWIN and BERRY, JJ., concur.

HALLEY, C. J., .concurs in part and dissents as to exemplary damages.

HODGES, J., concurs in part and dissents in part.

BLACKBIRD and LAVENDER, JJ., dissent.